PREET BHARARA
United States Attorney for the
Southern District of New York
By:  STEPHEN CHA-KIM
Assistant United States Attorney
86 Chambers Street, Third Floor
New York, New York 10007
Telephone: (212) 637-2768
Facsimile: (212) 637-2702
E-mail: stephen.cha-kim@usdoj.gov

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>    v.<br><br>505 CENTRAL AVENUE CORP. and<br>WEST-EX ASSOCIATES, INC.,<br><br>    Defendants. | **COMPLAINT**<br><br>**17 Civ. 351**<br><br>**Jury Trial Demanded** |

Plaintiff, the United States of America, by its attorney, Preet Bharara, United States Attorney for the Southern District of New York, alleges for its complaint as follows:

**PRELIMINARY STATEMENT**

1.      This is a civil action for declaratory relief, injunctive relief, and monetary damages under the Fair Housing Act, as amended, 42 U.S.C. §§ 3601 *et seq.* (the "Act"), brought by the United States of America on behalf of Michael Forster and The Michael Forster Supplemental Needs Irrevocable Trust (collectively, "Complainants") pursuant to 42 U.S.C. §§ 3612(o) and 3614(a), to redress discrimination on the basis of disability.

2.      As alleged more fully below, Defendant 505 Central Avenue Corp. ("505 Central Ave."), which owns and operates Thompkins Manor, a 155-unit housing cooperative located at

505 Central Avenue, White Plains, New York 10606, and Defendant West-Ex Associates, Inc. ("West-Ex"), which acts as property manager of Thompkins Manor on 505 Central Ave.'s behalf (collectively, "Defendants"), unlawfully discriminated against Complainants based on Michael Forster's disabilities.

3. Moreover, 505 Central Ave. and West-Ex have adopted and perpetuated a policy harming not just Complainants but other individuals with disabilities, constituting an unlawful pattern or practice of discrimination and denial of equal access to housing that raises an issue of general public importance.

4. Defendants' conduct violates the Act, should be declared unlawful and enjoined, and appropriate monetary damages should be awarded.

## JURISDICTION AND VENUE

5. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1345 and 42 U.S.C. §§ 3612(o) and 3614(a).

6. Venue is proper in this district pursuant to 28 U.S.C. § 1391 and 42 U.S.C. § 3612(o) because Defendants are situated in this district and the events giving rise to the Complaint occurred in this district.

## THE PARTIES

7. Plaintiff is the United States of America (the "United States").

8. Defendant 505 Central Ave. owns and operates a private, 155-unit housing cooperative located at 505 Central Avenue, White Plains, New York 10606, known as Thompkins Manor.

9. Defendant West-Ex, located at 119 East Hartsdale Avenue, Hartsdale, New York 10530, acts as property manager of Thompkins Manor on 505 Central Ave.'s behalf. Upon

information and belief, West-Ex acts as property manager for several housing cooperatives located in Westchester County and its environs.

10. Complainant Michael Forster ("Michael") is a 34-year old individual living with physical and mental disabilities, and currently resides in Port Chester, New York.

11. Complainant The Michael Forster Supplemental Needs Irrevocable Trust (the "Trust") is a living-needs trust created by Michael's parents, Denis Forster and Enid Forster, to support Michael's financial needs. Michael is the beneficiary of the Trust, and his parents are the trustees.

12. Each of the units owned by 505 Central Ave. at Thompkins Manor is a "dwelling" within the meaning of the Act, 42 U.S.C. § 3602(b).

13. Complainants are "aggrieved persons" as that term is defined in the Act, 42 U.S.C. § 3602(i), and have suffered damages as a result of Defendants' conduct.

**PROCEDURAL BACKGROUND**

14. On or about June 3, 2015, Complainants filed an administrative complaint with the U.S. Department of Housing and Urban Development ("HUD") alleging that 505 Central Ave. and West-Ex discriminated against them on the basis of disability in violation of the Act.

15. Pursuant to the requirements of 42 U.S.C. § 3610(a) and (b), the Secretary of HUD (the "Secretary") conducted and completed an investigation of the administrative complaint.

16. Based on the information gathered in the HUD investigation, the Secretary, pursuant to 42 U.S.C. § 3610(g)(1), determined that reasonable cause existed to believe that 505 Central Ave. discriminated against Complainants and violated the Act.

17.     On April 26, 2016, the Secretary issued a Charge of Discrimination pursuant to 42 U.S.C. § 3610(g)(2)(A), charging 505 Central Ave. with engaging in discriminatory housing practices against Complainants in violation of the Act.

18.     On May 10, 2016, 505 Central Ave. timely elected to have the charge resolved in a federal civil action pursuant to 42 U.S.C. § 3612(a). Following this election, the Secretary authorized the Attorney General to file this action on Complainants' behalf, pursuant to 42 U.S.C. § 3612(o)(1).

**FACTS**

Michael's Disabilities and Need for the Trust

19.     Michael lives with a number of disabilities, including congenital heart problems, developmental language disorder, learning disabilities, and depression. Despite being in his thirties, Michael has suffered multiple heart attacks. Michael has functional limitations in math, reading, and writing skills, which significantly affect his ability to carry out life activities such as working, driving, and managing money. He receives Social Security disability benefits ("SSDI") for persons found to have been disabled since before they became 22 years old.

20.     Michael is a person with disabilities as defined by the Act, 42 U.S.C. § 3602(h).

21.     In 2005, Michael's parents established the Trust to ensure that Michael would be financially supported and able to pay expenses like rent and medical bills for the rest of his life, even after their deaths.

22.     Prior to 2008, Michael lived with his mother, Enid. Seeking a more independent life, Michael moved out of his mother's home in or around 2008 and settled in a boarding house in White Plains, New York. However, this boarding house was not an adequate long term solution. Michael shared one kitchen and two bathrooms with nine other residents. The house also lacked

laundry facilities, did not have adequate heat, saw frequent electricity outages, had a non-functioning refrigerator, and was infested with rodents, bedbugs, and cockroaches. It also lacked an elevator, requiring Michael to reach his room only after climbing stairs with much difficulty.

23. Frustrated by Michael's poor quality of life at the boarding house, his parents began looking for alternative housing for him. They hoped to find a home that would give Michael some measure of independence, while also being located close to Enid's house in White Plains so that she could easily assist him with daily activities, like shopping, laundry, and going to doctor's appointments as needed.

24. The Forsters determined that buying a cooperative unit would be the best option for Michael, affording him housing security and a measure of independence within a hopefully welcoming community. The Trust was necessary to ensure Michael's access to such a home, as his disabilities would impose significant limitations on his ability to attend and understand cooperative owner meetings, recognize the need and arrange for repairs, pay regular maintenance fees, property taxes and utilities, purchase insurance, and participate in member voting and decisions.

Michael Finds an Ideal Home at Thompkins Manor

25. The Forsters carried out an exhaustive search, regularly viewing a number of apartments in the White Plains area.

26. On May 3, 2013, the Forsters' real estate broker found three one-bedroom units at Thompkins Manor, Apartment Numbers 316, 405, and 824. Over the next weeks, the Forsters visited Thompkins Manor to view the units on several occasions.

27. Thompkins Manor was an ideal location for Michael to relocate to, as it has an elevator and is closely situated to a grocery store and other retail outlets and services. Given the

nature of his disabilities, such proximity would make a great difference in Michael's ability to access necessities and live independently. Thompkins Manor also has the advantage of being located close to Michael's mother's house.

28. None of the other housing options that the Forsters had visited and were considering had the proximity to goods and services, and to Enid, as Thompkins Manor. Unlike Thompkins Manor, Enid was also concerned about the safety of the location of the other building that the Forsters were considering.

29. On May 20, 2013, the Trust made a cash offer to purchase Apt. 405. The seller accepted the offer.

30. On August 14, 2013, the Trust entered into a contract with the seller for $76,000, which was to be paid in cash. Michael's parents signed the contract as trustees.

31. As this process was unfolding, Michael was increasingly eager to move into his new home, regularly expressing to his parents that the conditions in the boarding house were becoming intolerable.

<u>Defendants Repeatedly Deny the Forsters' Housing Application and Requests for Accommodation</u>

32. On August 20, 2013, in accordance with 505 Central Ave.'s requirements of prospective purchasers of cooperative stock, the Trust submitted a fully completed application to West-Ex seeking occupancy approval from the 505 Central Ave. Board of Directors.

33. The application listed "Michael Forster (Supplemental Needs Irrevocable Trust)" as the applicant and stated that Michael would occupy the unit.

34. In addition to all required forms, the application package also included bank statements for the Trust as well as a Social Security statement showing that Michael received disability benefits.

35. Michael's father Denis also attached a cover letter to the application, which stated: "[A]ll of the financial obligations required to maintain the apartment at 505 Central Ave., Unit 405, White Plains, NY can be paid by Michael and/or the Trust. However, if the Cooperative feels that it is necessary, I am willing to personally serve as a guarantor for those obligations."

36. On August 27, 2013, Elizabeth Meneghin, a West-Ex employee, sent a letter to the Trust rejecting the Forsters' application for occupancy. The letter stated: "Please be advised that the Cooperative does not permit ownership by Trust. In addition, the Application could not be processed due to the fact that the package has not been submitted in accordance with the Board of Directors' qualification for purchase at this property."

37. West-Ex never forwarded the Forsters' housing application to 505 Central Ave. on its own initiative.

38. Following this rejection, the Forsters sought assistance from Westchester Residential Opportunities, Inc. ("WRO"), a fair housing organization. At WRO's suggestion, Denis Forster called West-Ex on January 14, 2014 to discuss the occupancy application and whether West-Ex and 505 Central Ave. would accommodate their request for ownership by trust in Michael's case. The West-Ex employee who answered the phone refused to discuss the application with Denis.

39. On February 27, 2014, assisted by WRO, Michael sent a letter to West-Ex describing his disabilities and the role played by the Trust, indicating his continued interest in living at Thompkins Manor, and requesting again a reasonable accommodation to allow the Trust to purchase a unit from 505 Central Ave. so that he could reside at Thompkins Manor. Michael received no response to the letter, which was sent by first class mail and was not returned as undelivered.

40. West-Ex again did not forward either the request for accommodation made by telephone by Denis Forster or the February 27, 2014 request by letter to 505 Central Ave., and made the decision to constructively deny the reasonable accommodation request on its own initiative.

41. West-Ex maintains an unlawful policy of not considering requests for reasonable accommodations made by such occupants for those properties, including requests to allow legal ownership by special-needs trusts. Upon information and belief, as a result of these policies, West-Ex has unlawfully denied, and continues to deny, housing opportunities and reasonable accommodations to Michael Forster as well as to other individuals with disabilities who have applied for housing in the various properties managed by West-Ex.

42. On June 7, 2014, Enid Forster sent a letter to both West-Ex and 505 Central Ave., again requesting a reasonable accommodation for her son by allowing the purchase of the unit by the Trust and reiterating that Denis Forster was willing to serve as guarantor. Enid enclosed with this letter a copy of Michael's February 27, 2014 letter and a copy of the "Joint Statement of HUD and the Department of Justice on Reasonable Accommodations under the Fair Housing Act."

43. Several weeks later, on July 9, 2014, Steven Accinelli, a lawyer representing both 505 Central Ave. and West-Ex, called Enid Forster to deny the reasonable accommodation request. Accinelli sent an email to Enid later that day stating that Thompkins Manor "does not permit ownership in the name of a trust for the reasons I explained" and that Defendants would not consider any accommodation. Accinelli suggested that the Forsters try other cooperatives and management companies in Westchester.

44. Neither 505 Central Ave. nor West-Ex has ever articulated why an accommodation to allow legal ownership by a special needs trust but physical occupancy by an individual would be unreasonable or impose any kind of burden.

45. By holding out and maintaining a rule banning legal ownership by special-needs trusts and a policy of refusing to consider any requests for reasonable accommodation to that purported rule, 505 Central Ave. has unlawfully denied, and continues to deny, housing opportunities and reasonable accommodations to Michael Forster as well as to other individuals with disabilities.

46. Rules and policies enforcing a blanket prohibition on legal ownership of cooperative units by special-needs trusts and a blanket refusal to consider reasonable accommodations to such a prohibition unlawfully hinder access to housing opportunities for persons with mental and physical disabilities and deny them the opportunity to lead independent lives.

<u>The Forsters Try to Find Other Housing and Michael Suffers Heart Attack</u>

47. As a result of Defendants' continuing rejections of his housing application and reasonable accommodation requests, Michael grew increasingly depressed, as he realized that he would have to continue living in the boarding house with its abysmal conditions. He became anxious that all cooperative buildings would treat him in the same manner as West-Ex and 505 Central Ave.

48. In the face of Defendants' denial of housing opportunity to Michael, the Forsters resumed their search for independent housing for Michael soon after they received the first rejection letter from West-Ex, in or around September 2013.

49.     Through the end of 2013 and into 2014, the Forsters worked with several brokers and looked at buildings throughout the area, including in Yonkers and New Rochelle, but none was a good fit for Michael because of location, his accessibility needs, and price.

50.     After investigating and visiting a building in Port Chester (the "Port Chester building") in March or April 2014, the Forsters made an offer to purchase a unit in that building for Michael in May 2014. Unfortunately, they were outbid by another buyer.

51.     Even as they continued this search, the Forsters remained hopeful about Michael moving into Thompkins Manor, which was still the best option for him, as they worked with the fair housing organization WRO to request a reasonable accommodation from Defendants.

52.     On May 15, 2014, Michael suffered a heart attack. As a result, he was hospitalized for a week in White Plains. Because convalescing in the boarding house was out of the question because of the stairs and unsanitary conditions, Michael was released to his mother's apartment. This apartment was not ideal for Michael's recovery, as it has only one bedroom, forcing Michael to stay in a pull-out couch, and is located up a half flight of stairs. Had Michael not been unlawfully denied housing at Thompkins Manor in 2013 and early 2014, he would have been able to recover from his heart attack in his own home.

53.     In the aftermath of Michael's heart attack, in late May 2014, the Forsters made another offer for a unit in the Port Chester building where they had been outbid. After several days of negotiating, their cash offer was accepted.

54.     Around the same time, the Forsters also continued to pursue a reasonable accommodation for housing at Thompkins Manor, still their ideal choice. Enid sent her written request on June 7, 2014.

55.     After Defendants' lawyer Accinelli denied the Forsters' reasonable accommodation request in July 2014, the Forsters were forced to move forward with the Port Chester apartment. Michael and his father prepared for and completed an interview with the cooperative board of the Port Chester building, which thereafter approved Michael's occupancy application and permitted the unit to be legally owned by the Trust. The closing was completed on October 2, 2014.

56.     Although the Port Chester building offers Michael a higher quality of life than remaining in the boarding house or staying with his mother, it has significant drawbacks in comparison to Thompkins Manor. The Port Chester building is not situated near any grocery stores, retail outlets, or other services, imposing a hardship on Michael given his limited mobility, whereas Thompkins Manor is located across the street from such shops. It is also twice as far from Michael's mother's home and harder to reach for her than Thompkins Manor. Enid therefore requires additional time and expense to reach her son as part of her routine and any emergency trips to help provide his care than would have been necessary had Michael been able to move into Thompkins Manor. Finally, the Port Chester building does not permit overnight guest parking, preventing Michael's parents from having desired overnight visits with their son.

## CLAIMS FOR RELIEF

### FIRST CLAIM: 42 U.S.C. § 3604(f)(1)

57.     Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 56 of this Complaint as if fully set forth in this paragraph.

58.     Defendants violated the Fair Housing Act, 42 U.S.C. § 3604(f)(1), by making unavailable or denying a dwelling to Complainants because of Michael Forsters' disabilities.

## SECOND CLAIM: 42 U.S.C. § 3604(f)(2)

59. Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 58 of this Complaint as if fully set forth in this paragraph.

60. Defendants violated the Fair Housing Act, 42 U.S.C. § 3604(f)(2), by discriminating against Complainants in the terms, conditions, and privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of disability.

## THIRD CLAIM: 42 U.S.C. § 3604(f)(3)(B)

61. Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 60 of this Complaint as if fully set forth in this paragraph.

62. Defendants violated the Fair Housing Act, 42 U.S.C. § 3604(f)(3)(B), by refusing to make reasonable accommodations in rules, policies, practices, or services when such accommodations may be necessary to afford a person with a disability equal opportunity to use and enjoy a dwelling.

## FOURTH CLAIM: PATTERN AND PRACTICE

63. Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 62 of this Complaint as if fully set forth in this paragraph.

64. Defendants' conduct described above constitutes:

   a. A pattern or practice of resistance to the full enjoyment of rights granted by the Fair Housing Act, 42 U.S.C. §§ 3601, *et seq.*, and/or

   b. A denial to a group of persons of rights granted by the Fair Housing Act, 42 U.S.C. §§ 3601, *et seq.*, which denial raises an issue of general public importance.

65.     Other persons may have been injured by Defendants' discriminatory actions and practices as described above, and such individuals are "aggrieved" persons under the Fair Housing Act, 42 U.S.C. §§ 3602(i) and 3614(d)(1)(B).

66.     The discriminatory actions of Defendants were intentional and taken in disregard of Complainants' rights.

## RELIEF REQUESTED

WHEREFORE, Plaintiff the United States of America requests that the Court enter judgment:

1.    Declaring that Defendants' policies and practices as set forth above violate the Fair Housing Act, as amended, 42 U.S.C. §§ 3601 *et seq.*;

2.    Enjoining Defendants, their officers, employees, agents, successors, and all other persons in active concert or participation with them, from:

   a. discriminating in the sale or rental, or otherwise making unavailable or denying a dwelling to any buyer or renter because of a disability of the buyer or renter, in violation of 42 U.S.C. § 3604(f)(1);

   b. discriminating in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such a dwelling, because of disability, in violation of 42 U.S.C. § 3604(f)(2);

   c. failing or refusing to make reasonable accommodations as required by 42 U.S.C. §§ 3604(f)(3)(B);

   d. failing or refusing to take such affirmative steps as may be necessary to restore, as nearly as practicable, Complainants, and any other individuals injured by

        Defendants' discriminatory conduct, to the position they would have been in but for the discriminatory conduct;

   e.  failing or refusing to take such affirmative steps as may be necessary to prevent the recurrence of any discriminatory conduct in the future and to eliminate, to the extent practicable, the effects of Defendants' discriminatory conduct.

3. Awarding monetary damages to Complainants for injuries caused by Defendants' discriminatory conduct, pursuant to 42 U.S.C. §§ 3612(o)(3) and 3613(c)(1);

4. Awarding monetary damages to other individuals injured by Defendants' discriminatory conduct, pursuant to 42 U.S.C. § 3614(d)(1)(B);

5. Assessing a civil penalty against Defendants in the maximum amount authorized by 42 U.S.C. § 3614(d)(1)(C) and 28 C.F.R. § 85.3(b)(3) to vindicate the public interest; and

6. Granting such further relief as this Court may deem just and proper.

The United States requests trial by jury.

                                LORETTA LYNCH
                                Attorney General of the United States

                              By: */s/ Vanita Gupta*
                                VANITA GUPTA
                                Principal Deputy Assistant Attorney General
                                Civil Rights Division

Dated: New York, New York        PREET BHARARA
      January 18, 2017               United States Attorney

                              By: */s/ Stephen Cha-Kim*
                                STEPHEN CHA-KIM
                                Assistant United States Attorney
                                86 Chambers Street, Third Floor
                                New York, New York 10007
                                Tel.: (212) 637-2768
                                Fax: (212) 637-2702
                                Email: stephen.cha-kim@usdoj.gov